**GOOD | GUSTAFSON | AUMAIS LLP**
CHRISTOPHER T. AUMAIS, SBN 249901
CHRISTOPHER B. GOOD, SBN 232722
RYAN GUSTAFSON, SBN 220802
2330 Westwood Boulevard, Suite 103
Los Angeles, California 90064
Telephone: (310) 274-4663
E-mail: cta@ggallp.com
E-mail: cbg@ggallp.com
E-mail: jrg@ggallp.com

**SHENAQ PC**
Amir Shenaq, Esq.*
3500 Lenox Road, Ste. 1500
Atlanta GA 30326
Tel: (888) 909-9993
amir@shenaqpc.com

**THE KEETON FIRM LLC**
Steffan T. Keeton*
100 S Commons, Ste. 102
Pittsburgh PA 15212
Tel: (888) 412-5291
stkeeton@keetonfirm.com

**Pro hac vice* forthcoming
*Counsel for Plaintiff and the Proposed Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISON

| | |
|---|---|
| Jose Luna, individually, and on behalf of those similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>Three Wishes Foods, Inc.,<br><br>Defendant. | CASE NO.<br><br>**CLASS ACTION COMPLAINT**<br><br>**Demand for Jury Trial** |

## INTRODUCTION

1. Plaintiff Jose Luna, by and through his counsel, brings this class action against Defendant Three Wishes Food, Inc. ("Defendant") to seek redress for its unlawful and deceptive practices in labeling and marketing the THREE WISHES cereal which make protein claims on the front and back of the product packaging - including that the cereal contains 8 grams of protein, is high protein, and offers more protein than the competition - while omitting a statement of the corrected amount of protein from the Nutrition Facts Panel ("NFP").

2. Consumers are increasingly health conscious and, as a result, many consumers seek foods high in protein. To capitalize on this trend, Defendant markets its Products[1] as being "high in protein" and offering "more protein" than competitors.

3. The Food and Drug Administration ("FDA") prohibits "high" protein claims unless the food product provides at least 20% of the daily recommended value for protein. *See* 21 C.F.R. § 101.54(b) (requiring "20 percent or more of the RDI or the DRV" for "high" claims).

4. Further, Defendant prominently labels its Products as being "high in protein" and providing specific amounts of protein per serving depending on the product, such as "8g PROTEIN" per serving on the front and back of its Cinnamon flavored cereal. Consumers, in turn, reasonably expect that each product will actually provide the amount of protein per serving claimed on the front of the product package in a form the body can use.

5. The FDA prohibits such label claims about the amount of protein unless manufacturers also provide additional information in the nutrition fact panel about how much of the recommended daily value for protein that the product will actually provide. 21 C.F.R. §§ 101.9(c)(7)(i), 101.13(b), (n). That is because the FDA recognizes

---

[1] At the time of this filing, the following THREE WISHES cereal products are included in this definition: Cinnamon, Fruity, Frosted, Cocoa, Honey, and Unsweetened. This definition is not exhaustive, and shall include all of Defendant's products that are similarly deceptively marketed.

that (1) when manufacturers tout an amount of protein on the front label, that amount is likely to be material to purchasing decisions, even though reasonable consumers may not know the total amount of protein they need to ingest on a daily basis, and (2) not all proteins are the same in their ability to meet human nutritional requirements, so a simple statement about the number of grams does not actually inform consumers about how much usable protein they are receiving. Some proteins are deficient in one or more of the nine amino acids essential to human protein synthesis and/or are not fully digestible within the human gut. When a human body uses up the least prevalent essential amino acid from a food product, protein synthesis shuts down and all of the remaining amino acids from that protein source degrade mostly into waste. Likewise, whatever portion of a protein source is not digestible is similarly unavailable for protein synthesis. A protein's ability to support human nutritional requirements is known as its "quality."

6. The FDA required method for measuring protein quality is called the Protein Digestibility Corrected Amino Acid Score ("PDCAAS"). It combines a protein source's amino acid profile and its percent digestibility into a discount factor ranging from 0.0 to 1.0 that, when multiplied by the total protein quantity, shows how much protein in a product is actually available to support human nutritional requirements. The regulations term this the "corrected amount of protein per serving." 21 C.F.R. § 101.9(c)(7)(ii). For example, a PDCAAS of .5 means that only half of the protein in that product is actually available to support human protein needs. If the product contained 10 grams total protein per serving, the corrected amount of protein would be only 5 grams per serving. As a result, protein products can vary widely in their ability to support human protein needs—even between two comparator products with the same total protein quantity.

7. Because consumers are generally unaware about the usability of various proteins, and may even be unaware of the total amount of usable protein they should ingest each day, the FDA prohibits manufacturers from advertising or promoting

their products with a protein claim unless they have satisfied two requirements. First, the manufacturer must calculate the "corrected amount of protein per serving" based on the quality of the product's protein using the PDCAAS method. Second, the manufacturer must use the PDCAAS computation to provide "a statement of the corrected amount of protein per serving" in the nutrition facts panel ("NFP") "expressed as" a percent daily value ("%DV") and placed immediately adjacent to the statement of protein quantity. 21 C.F.R. § 101.9(c)(7)(i)-(iii). The %DV is the corrected amount of protein per serving divided by the daily reference value for protein of 50 grams. *Id.* Using the same example of a product containing 10 grams total protein per serving with a PDCAAS of .5, the %DV is 10% (5g/50g). Had all of the protein in the product been useful in human nutrition, the %DV would be 20% (10g/50g). The FDA regulations that govern nutrient content claims are also clear that a manufacturer may not make any claims on the front or back packaging about the amount of protein in the product unless it complies with these two requirements. See 21 C.F.R. § 101.13(b) ("A nutrient content claim[] may not be made on the label…unless the claim is made in accordance with this regulation [i.e., § 101.13]…" and (n) ("[n]utrition labeling in accordance with § 101.8…shall be provided for any food for which a nutrient content claim is made"); accord 58 Fed. Reg. 2302, 23310 (manufacturer can only make a "nutrient content claim…on the label or in labeling of a food, provided that the food bears nutrition labeling that complies with the requirements in proposed § 101.9.").

8. The primary protein sources in Defendant's Products are chickpeas and pea protein. The PDCAAS score is approximately .75[2] and .93,[3] which means Defendant's products will provide nutritionally less than the protein quantity

[2] Nosworthy, Matthew G et al. "Thermal processing methods differentially affect the protein quality of Chickpea (Cicer arietinum)." Food science & nutrition vol. 8,6 2950-2958. 12 May. 2020, doi:10.1002/fsn3.1597.

[3]FDA, *GRAS Notification for Roquette's Pea Protein Isolate*, https://www.fda.gov/media/134207/download#:~:text=Pea%20Protein%20Isolate%20is%20a,and%2093%25%20PDCAAS%20for%20adults.



GOOD GUSTAFSON AUMAIS LLP

claimed. Nevertheless, Defendant failed to provide in the NFP a statement of the corrected amount of protein per serving calculated according to the PDCAAS methodology and expressed as a %DV. Accordingly, the protein claims on the package, such as "8g PROTEIN" are unlawful in violation of parallel state and federal laws because Defendant did not comply with the regulatory requirements for making a protein claim. 21 C.F.R. § 101.9(c)(7)(i), 101.13(b), (n). The failure to include a statement of the corrected amount of protein inside the NFP also rendered the NFP itself unlawful. *Id.* § 101.9(c)(7)(i).

9. In addition to being unlawful under 21 CFR §§ 101.9 and 101.13, Defendant's prominent protein claims on the package while omitting the statement of the corrected amount of protein per serving expressed as a %DV in the NFP, is also likely to mislead reasonable consumers. Consumers reasonably expect that Defendant's products will actually provide nutritionally the full amount of protein per serving claimed on the front and back of the package and stated in the protein quantity section of the NFP, i.e., that the products contain high quality proteins. But Defendant's products do not do so and instead contain low quality proteins. Had Defendant included a statement of the corrected amount of protein per serving in the NFP, as it was required to do under the law, it would have revealed that the product contains low quality proteins. That information was material to reasonable consumers.

10. Defendant's unlawful and deceptive conduct is not limited to the specific protein representations and the failure to include the %DV.

11. Additionally, Defendant misrepresents that its Products are "high in protein" despite failing to provide sufficient amounts of quality protein to make that representation.

12. Defendant's unlawful and misleading labeling caused Plaintiff and members of the class to pay a price premium.

## PARTIES

13. Plaintiff is a citizen of California, who purchased the Products during the Class Period, as described herein. The advertising and labeling on the package of the Products purchased by Plaintiff, including the protein representations, is typical of the advertising and labeling of the Products purchased by members of the Class.

a. On multiple occasions within the past year, Plaintiff purchased the Cinnamon and Cocoa flavors from Whole Foods stores in San Francisco County, California on multiple occasions.

b. Plaintiff made each of his purchases after reading and relying on the truthfulness of Defendant's labels that promised the Products provided a specific number of grams of protein per serving. For example, he purchased the Cinnamon and Cocoa flavors relying on the representation of "8g PROTEIN" on the front and back labels. He also relied on the representation that the Product was high in protein and offered more protein than the competition. He believed the truth of each representation, i.e., that the product was high in protein and would actually provide the full amount of protein claimed on the labels in a form human bodies could utilize. He relied on the Products to meet his protein dietary needs. Had Defendant complied with the law and not made the protein claims on the Products, he would not have been drawn to the Products and would not have purchased them. At a minimum, Plaintiff would have paid less for each Product.

c. Moreover, had Defendant adequately disclosed the corrected amount of protein per serving for each Product expressed as a %DV, as FDA regulations require, Plaintiff would not have purchased the Products or would have, at minimum, paid less for them. Plaintiff regularly checks the NFP before purchasing any product for the first time, including the %DV column for protein when manufacturers provide it, and he uses

that information as a basis of comparison between similar products. He looked at and read the NFP on the Product before purchasing it for the first time. Manufacturers do not always disclose a %DV for protein, but when they do, he prefers products that provide more of the recommend daily amount of protein (i.e., the one with a higher %DV). When a manufacturer does not provide a %DV for protein, he can only go off of the stated grams of protein, and he assumes that all of those disclosed grams are in a form his body can use as protein.

d. For example, with the Products, Plaintiff was looking for a product that would provide 8 grams of useable, i.e., high quality, protein per serving. Had Defendant disclosed that the product provided nutritionally only deficient levels of protein, Plaintiff would have used that information as a basis to compare similar products and would have preferred, instead, to purchase a different product with a higher %DV. At a minimum he would have paid less for Defendant's product. Without the statement of the corrected amount of protein per serving in the form of a %DV, the only information Plaintiff had about the Products was the 8 gram protein quantity, and he did in fact believe he was receiving 8 grams of high-quality protein when he purchased the Products.

e. Plaintiff continues to desire to purchase protein products, including those marketed and sold by Defendant, and would like to purchase products that provide 8 grams of protein per serving. If the Products that currently make unlawful protein claims are reformulated to ensure they provide, in a usable form, the grams of protein that are represented on the labels, or their labels are changed to provide non-misleading information, Plaintiff would likely purchase those Products again in the future but will not do so until then. Plaintiff regularly visits stores where the Products and other protein products are sold. Because

Plaintiff does not know the formula for Defendant's products, which can change over time, and cannot test whether the Products provide the amount of digestible protein that is represented on the label without first purchasing the Product, Plaintiff will be unable to rely on Defendant's labels when shopping for protein products in the future absent an injunction that prohibits Defendant from mislabeling its Products. Plaintiff would also be forced to retest and/or reanalyze each Product that makes a protein claim but fails to include the %DV at each time of purchase because such Products' ingredient list and labeling would not reveal any changes in the amount of digestible protein, even if such changes took place. In addition, at present Plaintiff cannot rely on the accuracy of Defendant's labels for the entire line of Products, which Plaintiff is also interested in purchasing with labeling that comports with regulations. Should Defendant begin to market and sell a new line of products, Plaintiff could also be at risk for buying another one of Defendant's products in reliance on the same or similar misrepresentation and omissions. And because of Defendant's unlawful and misleading labels on its Products, Plaintiff cannot make informed choices between protein products offered by Defendant and protein products offered by other manufacturers, such as choices based on price and relative nutritional content.

f. Plaintiff and members of the Class have been economically damaged by their purchase of the Products because the advertising for the Products was and is untrue and/or misleading under state law and the products are misbranded; therefore, the Products are worth less than what Plaintiff and members of the Class paid for them and/or Plaintiff and members of the Class did not receive what they reasonably intended to receive.

14. Defendant is a Delaware corporation with its principal place of business in New York, New York. Defendant produces, markets and distributes its consumer food products in retail stores across the United States including stores physically located in the State of California and in this district.

15. Whenever reference is made in this Complaint to any representation, act, omission, or transaction of a defendant, that allegation shall mean that the defendant did the act, omission, or transaction through its officers, directors, employees, agents, and/or representatives while they were acting within the actual or ostensible scope of their authority.

## JURISDICTION AND VENUE

16. This Court has personal jurisdiction over Defendant. Defendant purposefully avails itself of the California consumer market and distributes the Products to many locations within this District and hundreds of retail locations throughout the State of California, where the Products are purchased by hundreds of consumers every day.

17. This Court has original subject-matter jurisdiction over this proposed class action pursuant to 28 U.S.C. § 1332(d), which, under the provisions of the Class Action Fairness Act ("CAFA"), explicitly provides for the original jurisdiction of the federal courts in any class action in which at least 100 members are in the proposed plaintiff class, any member of the plaintiff class is a citizen of a State different from any defendant, and the matter in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs. Plaintiff alleges that the total claims of individual members of the proposed Class (as defined herein) are well in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs.

18. Venue is proper in this District under 28 U.S.C. § 1391(a). Plaintiff's purchases of Defendant's Products, substantial acts in furtherance of the alleged improper conduct, including the dissemination of false and misleading information



GOOD GUSTAFSON AUMAIS LLP

regarding the nature, quality, and/or ingredients of the Products, occurred within this District and the Defendant conducts business in this District.

## DIVISIONAL ASSIGNMENT

19. Pursuant to Civil Local Rule 3-2(c-d), a substantial part of the events giving rise to the claims arose in San Francisco County, and this action should be assigned to the San Francisco Division.

## FACTUAL ALLEGATIONS

### A. Defendant Manufactures, Labels, and Advertises the Product

20. Defendant manufactures, distributes, markets, advertises, and sells a variety of cereal products under the brand name "THREE WISHES." These Products have had packaging during the Class Period that predominately, uniformly, and consistently states on the principal display panel of the product labels that they contain and provide a certain amount of protein per serving.

21. The representations that the Products contain and provide a specific amount of protein per serving were uniformly communicated to Plaintiff and every other person who purchased any of the Products in California. The same or substantially similar product label has appeared on each Product during the Class Period in the general form of the following example:






GOOD GUSTAFSON AUMAIS LLP

22. The back of the Product's packaging includes claims that the Product is high in protein, offers 8 grams of protein, and more protein than competing products:




More Protein, Less Sugar, Better Ingredients

They say good things come in threes...as luck would have it, so do we. Our family of three wished for a cereal that everyone in the house could love. Imagine a tasty cereal that's high in protein, low in sugar, with healthier ingredients. Until now, most cereals have been made from grains. We had a different vision - one that uses nutrient-rich, plant-based ingredients and nothing else. Although it took a little more than just wishing, the cereal of our dreams is here.

GOOD GUSTAFSON AUMAIS LLP

23. The nutrition facts panel on the side of the Products uniformly and consistently failed to provide any statement of the corrected amount of protein per serving, expressed as a %DV, during the Class Period. The nutrition facts panels of the Products have appeared consistently during the Class Period in the general form of the following example (from the Cinnamon flavor):

**Nutrition Facts**

7 Servings Per Container

| **Serving Size** | **3/4 cup (35g)** |
| --- | --- |
| Amount Per Serving **Calories** | **120** |
| | % Daily Value* |
| **Total Fat** 2g | **3%** |
| Saturated Fat 0g | **0%** |
| *Trans* Fat 0g | |
| **Cholesterol** 0mg | **0%** |
| **Sodium** 100mg | **4%** |
| **Total Carbohydrate** 18g | **7%** |
| Dietary Fiber 3g | **11%** |
| Total Sugars 3g | |
| Includes 3g Added Sugars | **6%** |
| **Protein** 8g | |
| Vitamin D 0mcg | 0% |
| Calcium 150mg | 10% |
| Iron 1.9mg | 10% |
| Potassium 300mg | 6% |

* The % Daily Value (DV) tells you how much a nutrient in a serving of food contributes to a daily diet. 2,000 calories a day is used for general nutrition advice.

24. As described in detail below, Defendant's advertising and labeling of the Products as containing and providing specific amounts of protein per serving is unlawful, misleading, and intended to induce consumers to purchase the Products at a premium price, while ultimately failing to meet consumer expectations. The Products' label protein claims are unlawful because Defendant did not: (1) calculate the "corrected amount of protein per serving" based on the quality of the product's protein using the PDCAAS method; and (2) provide a statement of that corrected amount of protein per serving in the NFP, expressed as a %DV. 21 C.F.R. §

101.9(c)(7)(i) & (iii). The unlawful protein claims induced consumers to purchase the Products at a premium price. Had Defendant complied with FDA regulations and not included a protein claim on the label of its Products, reasonable consumers would not have purchased them or would have paid less for the Products.

25. Defendant's failure to provide the required statement of the corrected amount of protein per serving, as well as Defendant's prominent protein claims made in the absence of any statement of the corrected amount of protein in the NFP, also deceived and misled reasonable consumers into believing that a serving of the Products will provide the grams of protein represented on the label, when that is not true. Had Defendant complied with the law, the statement of the corrected amount of protein would have revealed that the Products provide significantly less of the daily value of protein than high quality protein products with comparable protein quantities. The omission of this information allowed Defendant to charge a price premium. Had reasonable consumers been informed of the %DV for protein, as required by FDA regulations, they would not have purchased or would have paid less for the Products.

**B. Consumer Demand for Protein**

26. Consumers are focused on increasing the amount of protein in their diets. This increased demand indicates that consumers are willing to pay a premium for products labeled and marketed as high protein.[4]

27. Many American consumers are health conscious and seek wholesome, natural foods to keep a healthy diet, so they routinely rely upon nutrition information when selecting and purchasing food items. As noted by FDA Commissioner Margaret Hamburg during an October 2009 media briefing, "[s]tudies show that consumers trust and believe the nutrition facts information and that many consumers use it to

[4] *See* Brooks, Robert & Simpson, S.J. & Raubenheimer, David. (2010*). The price of protein: Combining evolutionary and economic analysis to understand excessive energy consumption.* Obesity Reviews : an official journal of the International Association for the Study of Obesity. 11. 887-94. 10.1111/j.1467-789X.2010.00733.x.

help them build a healthy diet." Indeed, the FDA recommends relying on Nutrition Facts Labels as the primary tool to monitor the consumption of protein.[5]

28. Protein is found throughout the body—in muscle, bone, skin, hair, and virtually every other body part or tissue. The health benefits of protein are well studied and wide ranging. Scientific studies have confirmed that protein can assist in weight loss, reduce blood pressure, reduce cholesterol, and control for risk factors for cardiovascular diseases. The National Academy of Medicine recommends that adults get a minimum of .8 grams of protein for every kilogram of body weight per day, or just over 7 grams for every 20 pounds of body weight.[6] For a 140-pound person, that means about 50 grams of protein each day. For a 200-pound person, that means about 70 grams of protein each day.

29. The health benefits of protein are just as important, if not more important, for children. Children are in a relative state of constant growth and rely on protein as the building block of muscle, bone, skin, hair, and virtually every other body part or tissue. The National Academies of Science recommends the following amounts of daily intake of protein based on age group: 1-3 years old: 13g of protein per day; 4-8 years old: 19g of protein per day; 9-13 16 years old: 34g of protein per day.[7]

30. Protein quantity by itself does not tell the full story of protein from a human nutritional standpoint. A protein's quality is also critical because humans cannot fully digest or utilize some proteins. Proteins are not monolithic. They are simply chains of amino acids, and different types of amino acids chained together in different ways will make different types of proteins. Further, the makeup of the

---

[5] FDA Protein Fact Sheet, https://www.accessdata.fda.gov/scripts/InteractiveNutritionFactsLabel/factsheets/Protein.pdf.

[6] National Academies of Medicine. Dietary Reference Intakes for Energy, Carbohydrate, Fiber, Fat, Fatty Acids, Cholesterol, Protein, and Amino Acids (Macronutrients).

[7] *Id.*



GOOD GUSTAFSON AUMAIS LLP

protein changes the function of that protein in the body, and certain types of proteins are more easily digested and used by humans than others.

31. All of a human's proteins are formed through the process of protein synthesis within their own bodies. That is, although humans consume dietary proteins, they digest those proteins, break them down into their constituent amino acids, and then use those amino acids as building blocks to synthesize the human proteins necessary for life, tissue repair, and other functions. Of the twenty total amino acids, humans can produce only eleven of them on their own. Humans cannot produce, under any circumstances, nine of the amino acids required for protein synthesis. These nine amino acids are called the "essential amino acids" and they must be supplied through the diet.

32. All nine essential amino acids are necessary for protein synthesis to take place. Lacking even one essential amino acid will prevent protein synthesis from occurring, and the rest of the proteins will degrade into waste. Accordingly, once the body uses up the limiting essential amino acid from a protein source, the remainder of that protein becomes useless to human protein synthesis and has little nutritional value. As the FDA has explicitly recognized, "[b]ecause excess amino acids are not stored in the body, humans need a constant supply of good quality dietary proteins to support growth and development." 58 Fed. Reg. 2079 at 2101. High-quality proteins, therefore, are those that contain all nine essential amino acids because they have a greater effect on protein synthesis and are fully digestible. A dietary protein containing all of the essential amino acids in the correct proportions is typically called a "complete protein."

33. A protein source's digestibility also affects the amount of useable protein a person receives from consuming it. Plant-based proteins like oats are approximately 80% digestible, meaning 20% of the protein from that source will simply pass through the body without ever being absorbed at all.

34. As the FDA has stated in official guidance, "Accurate methods for determining protein quality are necessary because different food protein sources are not equivalent in their ability to support growth and body protein maintenance." 56 Fed. Reg. 60366, § B. The Protein Digestibility Corrected Amino Acid Score ("PDCAAS"), is the FDA mandated measure of protein quality, and it accounts for both the amino acid profile and the digestibility of the protein. 21 C.F.R. § 101.9(c)(7)(ii).

35. The PDCAAS method requires the manufacturer to determine the amount of essential amino acids that the food contains and then combine that with the proteins' digestibility into an overall discount factor (i.e., a "score" from 0.0-1.0) that represents the actual amount of protein the food provides nutritionally when multiplied by raw protein quantity. The regulations term this the "corrected amount of protein per serving." 21 C.F.R. § 101.9(c)(7)(i).

36. Defendant uses plant-based proteins in its products. Because of the differences in benefits depending on the amino acid composition of a protein, the source of protein is important. Although some plants can be high quality protein sources, most plant-based proteins do not contain all nine essential amino acids and are low quality to humans. Chickpea and pea proteins all have PDCAAS scores of between .75. and .93, meaning approximately 7-25% of the protein from those sources will be useless to humans nutritionally speaking.

37. Accordingly, Defendant's use of low-quality proteins in the Products means that they actually provide far less protein to humans than the Product labels claim.

**C. <u>Defendant Violates Identical Federal and State Regulations</u>**

**a. Federal and State Regulations are Identical**

38. The FDA oversees the regulation and labeling of food pursuant to the Federal Food, Drug and Cosmetic Act ("FDCA").

39. California's Sherman Food, Drug and Cosmetic Law, Cal. Heath & Saf. Code § 110765 et seq. (the "Sherman Law"), incorporates all food labeling regulations promulgated by the FDA under the FDCA. *See e.g.*, Cal. Heath & Saf. Code § 110100(a) ("All food labeling regulations and any amendments to those regulations adopted pursuant to the federal act, in effect on January 1, 1993, or adopted on or after that date shall be the food labeling regulations of this state."), § 110380 and § 110505.

40. The federal laws and regulations discussed below are applicable nationwide to all sales of packaged food products. Additionally, none of the California laws sought to be enforced here imposes different requirements on the labeling of packaged food for sale in the United States.

41. To be clear, Plaintiff does not allege any claims pursuant to the FDCA and Sherman Law and relies on these regulations only to the extent they provide a predicate basis for liability under state and common law, as set forth herein.

b. **Regulations Governing the Labeling of Food Products**

42. 21 U.S.C. § 343 addresses misbranded food and states that a "food shall be deemed to be misbranded – (a) If (1) its labeling is false or misleading in any particular, or (2) in the case of a food to which section 350 of this title applies, its advertising is false or misleading in a material respect or its labeling is in violation of section 350(b)(2) of this title." *See* 21 U.S.C. § 343(a).

43. Generally, a manufacturer is not required to include the DRV for protein. However, when a product's label makes a nutrient content claim related to protein content, the manufacturer is required to include the DRV.[8]

44. To make a claim that a food is "high" in protein, the foods must meet a certain level of Reference Daily Intake (RDI) or Daily Reference Value (DRV). For

[8] 21 C.F.R. § 101.9(c)(7) and *see Guidance for Industry: A Food Labeling Guide*, U.S. FOOD & DRUG ADMINISTRATION, https://www.fda.gov/files/food/published/Food-Labeling-Guide-%28PDF%29.pdf at N22 ("The percent of the DRV is required if a protein claim is made for the product or if the product is represented or purported to be for use by infants or children under 4 years of age.") (last visited March 20, 2022).



GOOD GUSTAFSON AUMAIS LLP

example, 21 C.F.R. § 101.54 requires that the "food contains 20 percent or more of the RDI or the DRV per reference amount customarily consumed."

c. **The High Protein Claims Were Unlawful and Deceptive Because the Products Are Not High in Protein.**

45. The Products contain less than the required 20% DRV to make "high protein" claims.

46. Even if the proteins were nutritionally complete proteins, the Products only contain 16% of the DRV for protein.

47. With the PDCAAS adjustment, this number is further diminished.

48. Defendant's representation that the Products are high protein violates both state and federal law.

d. **The Front and Back Label Protein Claims Were Unlawful Due to the Omission of the %DV Inside the NFP as was the NFP Itself.**

49. A nutrient content claim is a claim that "expressly or implicitly characterizes the level of a nutrient." 21 C.F.R. § 101.13(b). "Express" nutrient content claims include any statement outside the Nutrition Facts Panel, about the level of a nutrient. 21 C.F.R. 101.13(b)(1). Moreover, stating information from the nutrition facts panel (such as grams protein per serving) elsewhere on the package necessarily constitutes a nutrient content claim. 21 C.F.R. § 101.13(c).

50. The FDA has always considered nutrient content claims to be "a marketing activity," the purpose of which is to advertise a specific product as a "significant source" of the relevant nutrient. 56 Fed. Reg. 60366, 60372, 60375. The FDA has long been suspicious of nutrient content claims and has repeatedly stated that such claims can be misleading, so the rules that govern them are far more restrictive. Indeed, "the general rule is that 'nutrient content claims' are not permitted on food labels" and must instead satisfy all of the requirements of § 101.13 before being authorized to appear at all.

51. FDA regulations specifically condition the ability to make a nutrient content claim on compliance with the rules governing the NFP. Section 101.9(c)(7)(i), in particular, sets forth special rules for the NFP when manufacturers make a protein claim outside the NFP. It provides that "[a] statement of the corrected amount of protein per serving, as determined in paragraph (c)(7)(ii) of this section, calculated as a percentage of the RDI or DRV for protein, as appropriate, and expressed as a Percent of Daily Value . . . shall be given if a protein claim is made for the product . . ." 21 C.F.R. 101.9(c)(7)(i) (emphasis added). If a manufacturer does not want to perform PDCAAS and provide a statement of the corrected amount of protein per serving in the NFP, then it shall not make any protein claims.

52. The regulation governing nutrient content claims, section 101.13, also makes this plain. Section 101.13(n) provides that "[n]utrition labeling in accordance with § 101.9 . . . shall be provided for any food for which a nutrient content claim is made" and § 101.13(b) states "a nutrient content claim[] may not be made on the label . . . unless the claim is made in accordance with this regulation [i.e., § 101.13] " In other words, a manufacturer may not make any protein nutrient content claims on the labels of their products unless they have complied with the requirements for protein labeling in the nutrition facts panel pursuant to section 101.9(c)(7). Indeed, the FDA made clear when promulgating § 101.13(n) that it means that a manufacturer can only make "a nutrient content claim . . . on the label or in labeling of a food, provided that the food bears nutrition labeling that complies with the requirements in proposed § 101.9." 58 Fed. Reg. 2302, 23310.

53. Further, FDA regulations require the %DV for protein to be calculated using PDCAAS, a method that accounts for both protein quantity and protein quality. 21 C.F.R. § 101.9(c)(7)(i)-(iii); FDA Food Labeling Guide, p. 29, Question N.22.4 The first step is to calculate the "corrected amount of protein per serving" by multiplying protein quantity by the PDCAAS quality value, and then dividing that "corrected


GOOD GUSTAFSON AUMAIS LLP

amount" by 50 grams (the "recommended daily value" for protein) to come up with the %DV. *Id.*

54. The Products, currently or during the Class Period, all made protein claims on the label but failed to provide a statement of the corrected amount of protein per serving in the NFP calculated according to the PDCAAS method. The protein claims on the Products are, therefore, unlawful, and were never permitted to be on the labels in the first instance under §§ 101.9(c)(7)(i), 101.13(n), and 101.13(b).

55. Defendant's failure to include a statement of the corrected amount of protein per serving expressed as a %DV in the NFP also renders the NFP itself unlawful under §§ 101.9(c)(7)(i)-(iii).

56. Defendant's Products are, therefore, unlawful, misbranded, and violate the Sherman Law, California Health & Safety Code § 110660, *et seq*. Defendant, currently and during the Class Period, made protein content claims on the front and back of its Product packages even though it uniformly failed to provide a statement of the corrected amount of protein per serving in the NFP calculated according to the PDCAAS method and expressed as a %DV as required by 21 C.F.R. § 101.9(c)(7)(i). Defendant's failure to comply with this requirement render these protein claims unlawful per se and the product misbranded pursuant to § 101.13(n) and (b), as well as under § 101.9(c)(7)(i) itself. Defendant's NFPs are also unlawful and in violation of § 101.9(c)(7)(i)-(iii).

e. **The Products' Labeling Violates Federal and State Regulations**

57. Defendant's marketing, advertising, and sale of the Products violates the misbranding provisions of the Sherman Law (California Health & Safety Code § 110660, *et. seq.*), including but not limited to:

i. Section 110665 (a food is misbranded if its labeling does not conform with the requirements for nutrition labeling as set forth in 21 U.S.C. Sec. 11 343(q));



GOOD GUSTAFSON AUMAIS LLP

ii. Section 110705 (a food is misbranded if words, statements and other information required by the Sherman Law to appear on food labeling is either missing or not sufficiently conspicuous);

iii. Section 110760, which makes it unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food that is misbranded;

iv. Section 110765, which makes it unlawful for any person to misbrand any food; and

v. Section 110770, which makes it unlawful for any person to receive in commerce any food that is misbranded or to deliver or proffer for delivery any such food.

58. Defendant's marketing, advertising, and sale of the Products also violates the false advertising provisions of the Sherman Law (California Health & Safety Code § 110390, *et. seq.*), including, but not limited to:

i. Section 110390, which makes it unlawful to disseminate false or misleading food advertisements that include statements on products and product packaging or labeling or any other medium used to directly or indirectly induce the purchase of a food product;

ii. Section 110395, which makes it unlawful to manufacture, sell, deliver, hold or offer to sell any falsely or misleadingly advertised food; and

iii. Sections 110398 and 110400, which make it unlawful to advertise misbranded food or to deliver or proffer for delivery any food that has been falsely or misleadingly advertised.

59. By failing to include on the Product labels the nutritional information required by law, Defendant has violated the Act and the standards set by FDA regulations, including but not limited to 21 C.F.R. § 101.9 (c)(7) and 21 C.F.R. §§

101.13(i)(3), (b), (n), which have been incorporated by reference into the Sherman Law.

60. The aforementioned Sherman Law provisions stem from California's traditional, historic police power to regulate food labels, which long predates the FDCA. *See Plumley v. Massachusetts*, 155 U.S. 461, 472 (1894) ("If there be any subject over which it would seem the states ought to have plenary control, and the power to legislate in respect to which . . . it is the protection of the people against fraud and deception in the sale of food products"); *see also Brown v. Van's Int'l Foods, Inc.*, No. 3:22-cv-00001-WHO, 2022 WL 1471454, at *7 (N.D. Cal. May 10, 2022) ("[s]tates have traditionally possessed the power to protect their citizens from fraud and deception in the sale of food, and therefore there is a strong presumption against federal preemption in the area of marketing food"), quoting *Clancy v. Bromley Tea Co.*, 308 F.R.D. 564, 573 (N.D. Cal. 2013).

61. Moreover, while the Sherman Law directly incorporates the FDA food labeling regulations in Section 110665, Plaintiff base his claims on other Sherman Law provisions that independently prohibit the dissemination of "false or misleading food advertisements" (which include food labels) and the misbranding of food, including Sections 110705, 110760, 110765, 110390, 11039, 110398. These provisions, in particular, would exist even if the FDCA did not.

f. **The Omission of the %DV Was Misleading Under Traditional State Law Prohibitions Against Fraudulent and Deceptive Advertising.**

62. In addition to violating the aforementioned statutes, Defendant has violated the traditional common law duty not to commit fraud and mislead consumers about the characteristics and qualities of its Products, as well as traditional state law prohibitions on false and misleading advertising that long predate the FDCA or Sherman Law.



GOOD GUSTAFSON AUMAIS LLP

63. Defendant's use of protein nutrient content claims, while failing to include the required statement of the corrected amount of protein per serving in the NFP calculated using the PDCAAS method and expressed as a %DV, is misleading. Reasonable consumers are unaware of the nutritional value of various protein sources and upon seeing a front-label or back-label quantitative protein claim reasonably believe that all of the advertised protein will be nutritionally available—i.e., that the product contains high quality proteins. Had Defendant complied with the law, the statement of the corrected amount of protein expressed as a %DV would have revealed that the Products provide significantly less of the daily value of protein than high quality protein products with comparable protein quantities. Had reasonable consumers been informed of the %DV for protein, as required by FDA regulations, they would not have purchased or would have paid less for the Products.

64. Consumers lack the meaningful ability to test or independently ascertain the truthfulness of Defendant's food labeling claims, especially at the point of sale. They would not know the quality of protein in the Products or how much of the daily recommended value of protein they provide merely by looking elsewhere on the product package given Defendant's omissions. Its discovery requires investigation well beyond the grocery store aisle and knowledge of food chemistry beyond that of the average consumer. An average consumer does not have the specialized knowledge necessary to ascertain the nutritional value of the protein in the Products. The average reasonable consumer had no reason to suspect that Defendant's representations and omissions on the packages were misleading.

65. Defendant intends and knows that consumers will and do rely upon food labeling statements in making their purchasing decisions. Label claims and other forms of advertising and marketing drive product sales, particularly if placed prominently on the front of product packaging, as Defendant has done with its protein claims.

66. Defendant’s duty not to mislead consumers about the quality or nutritional value of the protein in its products does not stem from either the FDCA or California’s Sherman Law. Instead, that duty stems from traditional California prohibitions on misleading and deceptive advertising (including prohibitions on fraudulent omissions) that long predate the FDCA or Sherman Law, including the UCL's fraud prong, the CLRA, the FAL, and the common law tort of fraud.

g. **Defendant Misleadingly Markets the Products to Increase Profits and Gain a Competitive Edge**

67. In making unlawful, false, misleading, and deceptive representations, Defendant distinguishes the Products from its competitors’ products. Defendant knew and intended that consumers would purchase, and pay a premium for, products labeled with protein claims and that failed to reveal they provide less of the daily value of protein than comparable products with high quality proteins. By using this branding and marketing strategy, Defendant is stating that the Products are superior to, better than, and more nutritious and healthful than other products that do not make protein claims, or that do not make protein claims based on poorly- disclosed added ingredients, or that properly provide the required statement of the corrected amount of protein in the product as determined by the PDCAAS method and express as a %DV and otherwise do not mislead consumers about the quality or nutritional value of the protein in its products.

h. **Defendant Intends to Continue to Market the Products with Protein Claims**

68. Because consumers pay a price premium for products that make protein claims, and also pay a premium for products that provide more protein, by labeling its Products with protein claims and/or omitting the required statement of the corrected amount of protein per serving, Defendant is able to both increase its sales and retain more profits.



GOOD GUSTAFSON AUMAIS LLP

69. Defendant engaged in the practices complained of herein to further its private interests of: (i) increasing sales of the Products while decreasing the sales of competitors that do not misrepresent the number of grams of protein contained in its products, and/or (ii) commanding a higher price for its Products because consumers will pay more for the Products due to consumers' demand for products with protein claims.

70. The market for protein products is continuing to grow and expand, and because Defendant knows consumers rely on representations about the number of grams of protein in food products, Defendant has an incentive to continue to make such unlawful and misleading representations. In addition, other trends suggest that Defendant has no incentive to change its labeling practices.

71. For example, one market analysis revealed that between 2013-2017, product launches with a protein claim grew 31%.[9]

72. To capitalize on the growing market, Defendant continues to launch new product lines and flavors to diversify its portfolio to maintain its competitive edge. Moreover, Defendant has continued to replicate its misrepresentations on new products. It is therefore likely that Defendant will continue to unlawfully and/or misleadingly advertise the Products and perpetuate the misrepresentations regarding the protein in the Products.

**C. Plaintiff and Consumers Purchased the Products to Their Detriment**

73. Plaintiff and the Class Members reasonably relied to their detriment on Defendant's misleading representations and omissions.

74. Defendant's false, misleading, and deceptive misrepresentations and omissions are likely to continue to deceive and mislead reasonable consumers and the

[9] Gil Hyslop, *10 Key Snack Trends to Watch*, BAKERYANDSNACKS.COM (Sep. 28, 2021), https://www.bakeryandsnacks.com/Article/2018/11/26/10-key-snack-trends-to-watch.



GOOD GUSTAFSON AUMAIS LLP

general public, as they have already deceived and misled the Plaintiff and the Class Members.

75. In making the false, misleading, and deceptive representations and omissions described herein, Defendant knew and intended that consumers would pay a premium for Products labeled high protein over comparable products not so labeled.

76. As an immediate, direct, and proximate result of Defendant's false, misleading, and deceptive representations and omissions, Defendant injured the Plaintiff and the Class Members in that they:

a. Paid a sum of money for Products that were not what Defendant represented;

b. Paid a premium price for Products that were not what Defendant represented;

c. Were deprived of the benefit of the bargain because the Products they purchased were different from what Defendant warranted; and

d. Were deprived of the benefit of the bargain because the Products they purchased had less value than what Defendant represented.

77. Had Defendant not made the false, misleading, and deceptive representations and omissions, Plaintiff and the Class Members would not have been willing to pay the same amount for the Products they purchased, and, consequently, Plaintiff and the Class Members would not have been willing to purchase the Products.

78. Plaintiff and the Class Members paid for Products that were represented to have certain levels of protein but received Products that were deficient. The products Plaintiff and the Class Members received were worth less than the Products for which they paid.

79. Based on Defendant's misleading and deceptive representations, Defendant was able to, and did, charge a premium price for the Products over the cost

of competitive products that do not misrepresent the protein levels and are compliant with the law.

80. Plaintiff and the Class Members all paid money for the Products. However, Plaintiff and the Class Members did not obtain the full value of the advertised Products due to Defendant's misrepresentations and omissions. Plaintiff and the Class Members purchased, purchased more of, and/or paid more for, the Products than they would have had they known the truth about the Products. Consequently, Plaintiff and the Class Members have suffered injury in fact and lost money as a result of Defendant's wrongful conduct.

## CLASS DEFINITIONS AND ALLEGATIONS

81. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of himself, on behalf of all others similarly situated, and as a member of the classes defined as follows (collectively, the "Class" or "Classes"):

1. All citizens of California who, within the relevant statute of limitation periods, purchased Defendant's Products ("California Class");
2. All citizens of the United States who, within the relevant statute of limitations periods, purchased Defendant's Products ("Nationwide Class").

82. Excluded from the Class are Defendant, its parents, subsidiaries, affiliates, officers, and directors, those who purchased the Products for resale, all persons who make a timely election to be excluded from the Class, the judge to whom the case is assigned and any immediate family members thereof, and those who assert claims for personal injury.

83. The members of the Class are so numerous that joinder of all Class Members is impracticable. Defendant has sold, at a minimum, tens of thousands of units of the Products to Class Members.



GOOD GUSTAFSON AUMAIS LLP

84. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the putative classes that predominate over questions that may affect individual Class Members include, but are not limited to the following:

a. What is the PDCAAS for the protein in the Products;

b. Whether the marketing, advertising, packaging, labeling, and other promotional materials for the Products are unlawful and/or misleading;

c. Whether Defendant's actions violate Federal and California laws invoked herein;

d. Whether labeling the Products with a protein claim causes the Products to command a price premium in the market;

e. Whether Defendant's failure to provide a statement of the corrected amount of protein per serving in the Products sold to the Classes was likely to deceive reasonable consumers;

f. Whether representations regarding the number of grams of protein in the Products are material to a reasonable consumer;

g. Whether Defendant engaged in the behavior knowingly, recklessly, or negligently;

h. The amount of profits and revenues Defendant earned as a result of the conduct;

i. Whether Class members are entitled to restitution, injunctive and other equitable relief and, if so, what is the nature (and amount) of such relief; and

j. Whether Class members are entitled to payment of actual, incidental, consequential, exemplary and/or statutory damages plus interest thereon, and if so, what is the nature of such relief.

85. Plaintiff's claims are typical of those of other Class Members because Plaintiff, like all members of the classes, purchased Defendant's Products bearing the

high protein representations and Plaintiff sustained damages from Defendant's wrongful conduct.

86. Plaintiff will fairly and adequately protect the interests of the classes and has retained counsel that is experienced in litigating complex class actions. Plaintiff has no interests which conflict with those of the classes.

87. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, making it impracticable for Class Members to individually seek redress for Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

88. The prerequisites to maintaining a class action for equitable relief are met as Defendant has acted or refused to act on grounds generally applicable to the classes, thereby making appropriate equitable relief with respect to the classes as a whole.

89. The prosecution of separate actions by members of the classes would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendant. For example, one court might enjoin Defendant from performing the challenged acts, whereas another might not. Additionally, individual actions could be dispositive of the interests of the classes even where certain Class Members are not parties to such actions.

**FIRST CLAIM FOR RELIEF**

**Violations of the Unfair Competition Law ("UCL"),**

**Cal. Bus. & Prof. Code §§ 17200 *et seq*.**

90. Plaintiff repeats and realleges each and every factual allegation contained in the foregoing paragraphs as if fully set forth herein.

91. Plaintiff brings this claim individually and on behalf of the members of the proposed California Class against the Defendant.

92. Within four (4) years preceding the filing of this lawsuit, and at all times mentioned herein, Defendant has engaged, and continue to engage, in unlawful, unfair, and fraudulent trade practices in California by engaging in the unlawful, unfair, and fraudulent business practices outlined in this complaint.

93. In particular, Defendant has engaged, and continues to engage, in unlawful practices by, without limitation, violating the following state and federal laws: (i) the CLRA as described herein; (ii) the FAL as described herein; (iii) the advertising provisions of the Sherman Law (Article 3), including without limitation, California Health & Safety Code §§ 110390, 110395, 110398 and 110400; (iv) the misbranded food provisions of the Sherman Law (Article 6), including without limitation, California Health & Safety Code §§ 110660, 110665, 110705, 110760, 110765, and 110770; and (v) and federal laws regulating the advertising and branding of food in 21 U.S.C. § 343(a), *et seq.* and FDA regulations, including but not limited to 21 C.F.R. § 101.9 (c)(7), which are incorporated into the Sherman Law (California Health & Safety Code §§ 110100(a), 110380, and 110505).

94. In particular, Defendant has engaged, and continues to engage, in unfair and fraudulent practices by, without limitation, the following: (i) unlawfully making a protein claim on the package without complying with the regulatory requirements for making a protein claim set forth in 21 C.F.R. § 101.9(c)(7)(i)-(iii) and incorporated by reference by California's Sherman law; (ii) failing to provide a statement of the corrected amount of protein per serving in the NFP, calculated according to the

PDCAAS method and expressed as a %DV, as required by FDA regulations; and (iii) misleading reasonable consumers regarding the quality of protein in its products and its contribution to consumers' daily protein needs by omitting the %DV for protein.

95. Defendant's conduct constitutes an unfair business act and practice pursuant to California Business & Professions Code §§ 17200, *et seq*. (the "UCL"). The UCL provides, in pertinent part: "Unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising . . . ."

96. Defendant's knowing conduct, as alleged herein, constitutes an "unfair" and/or "fraudulent" business practice, as set forth in California Business & Professions Code §§ 17200-17208.

97. Defendant's conduct was and continues to be unfair and fraudulent because, directly or through its agents and employees, Defendant made materially false representations and omissions.

98. As described herein, Defendant made representations that the Products are high in protein when the Products are not high in protein.

99. Defendant is aware that the representations and omissions they have made about the Products were and continue to be false and misleading.

100. Defendant had an improper motive—to derive financial gain at the expense of accuracy or truthfulness—in its practices related to the labeling and advertising of the Products.

101. There were reasonable alternatives available to Defendant to further its legitimate business interests, other than the conduct described herein.

102. Defendant's misrepresentations of material facts, as set forth herein, also constitute an "unlawful" practice because they violate California Civil Code §§ 1572, 1573, 1709, 1710, 1711, and 1770 and the laws and regulations cited herein, as well as the common law.

GOOD GUSTAFSON AUMAIS LLP

103. Defendant's conduct in making the representations and omissions described herein constitutes a knowing failure to adopt policies in accordance with and adherence to applicable laws, as set forth herein, all of which are binding upon and burdensome to their competitors. This conduct creates an unfair competitive advantage for Defendant, thereby constituting an unfair business practice under California Business & Professions Code §§ 17200-17208.

104. In addition, Defendant's conduct was, and continues to be, unfair in that its injury to countless purchasers of the Products is substantial, and is not outweighed by any countervailing benefits to consumers or to competitors.

105. Moreover, Plaintiff and members of the California Class could not have reasonably avoided such injury. Defendant's material misrepresentations and omissions regarding the Products were likely to deceive, and Defendant knew or should have known that its misrepresentations and omissions were untrue and misleading. Plaintiff purchased the Products in reliance on the representations made by Defendant, including that the Products' labeling was accurate as alleged herein, and without knowledge of Defendant's misrepresentations and omissions.

106. Plaintiff and those similarly situated relied to their detriment on Defendant's unlawful, unfair, and fraudulent business practices. Had Plaintiff and those similarly situated been adequately informed and not deceived by Defendant, they would have acted differently by, without limitation: (i) declining to purchase the Products, (ii) purchasing less of the Products, or (iii) paying less for the Products.

107. Defendant's acts and omissions are likely to deceive the general public.

108. Defendant engaged in these deceptive and unlawful practices to increase its profits. Accordingly, Defendant has engaged in unlawful and fraudulent trade practices, as defined and prohibited by section 17200, *et seq*. of the California Business and Professions Code.

109. The aforementioned practices, which Defendant has used to its significant financial gain, also constitute unlawful competition and provide an

unlawful advantage over Defendant's competitors as well as injury to the general public.

110. As a direct and proximate result of such actions, Plaintiff and the other Class members have suffered and continue to suffer injury in fact and have lost money and/or property as a result of such deceptive and/or unlawful trade practices and unfair competition in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court. Among other things, Plaintiff and the Class members lost the amount they paid for the Products.

111. As a direct and proximate result of such actions, Defendant has enjoyed, and continues to enjoy, significant financial gain in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

112. Plaintiff seeks, on behalf of himself and those similarly situated, equitable relief, including the restitution for the premium and/or full price that they or others paid to Defendant as a result of Defendant's conduct. Plaintiff and the Class lack an adequate remedy at law to obtain such relief with respect to their "unlawfulness" claims in this UCL cause of action because the California Sherman Law does not provide a direct cause of action, so Plaintiff and the Class must allege those violations as predicate acts under the UCL to obtain relief.

113. Plaintiff also seeks equitable relief, including restitution, with respect to his UCL "fraudulent" prong claims. Pursuant to Federal Rule of Civil Procedure 8(e)(2), Plaintiff makes the following allegations in this paragraph only hypothetically and as an alternative to any contrary allegations in their other causes of action, in the event that such causes of action do not succeed. Plaintiff and the Class may be unable to obtain monetary, declaratory and/or injunctive relief directly under other causes of action and will lack an adequate remedy of law, if the Court requires them to show class-wide reliance and materiality beyond the objective reasonable consumer standard applied under the UCL, because Plaintiff may not be able to establish each Class Member's individualized understanding of Defendant's misleading

GOOD GUSTAFSON AUMAIS LLP

representations as described in this Complaint, but the UCL does not require individualized proof of deception or injury by absent class members. *See, e.g., Stearns v Ticketmaster*, 655 F.3d 1013, 1020, 1023-25 (distinguishing, for purposes of CLRA claim, among class members for whom website representations may have been materially deficient, but requiring certification of UCL claim for entire class). In addition, Plaintiff and the Class may be unable to obtain such relief under other causes of action and will lack an adequate remedy at law, if Plaintiff is unable to demonstrate the requisite *mens rea* (intent, reckless, and/or negligence), because the UCL imposes no such *mens rea* requirement and liability exists even if Defendant acted in good faith.

114. Plaintiff seeks, on behalf of those similarly situated, a declaration that the above-described trade practices are fraudulent, unfair, and/or unlawful.

115. Plaintiff seeks, on behalf of those similarly situated, an injunction to prohibit Defendant from continuing to engage in the deceptive and/or unlawful trade practices complained of herein. Such misconduct by Defendant, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendant will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendant to which they were not entitled. Plaintiff and those similarly situated have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

**SECOND CLAIM FOR RELIEF**

**Violations of the False Advertising Law ("FAL"),**

**Cal. Bus. & Prof. Code §§ 17500 *et seq*.**

116. Plaintiff repeats and realleges each and every factual allegation contained in the foregoing paragraphs as if fully set forth herein.

117. Plaintiff brings this claim individually and on behalf of the members of the proposed California Class against the Defendant.

118. Beginning at an exact date unknown to Plaintiff, but within four (4) years preceding the filing of the Class Action Complaint, Defendant made untrue, false, deceptive and/or misleading statements in connection with the advertising and marketing of the Products.

119. Defendant made representations and statements (by omission and commission) that led reasonable customers to believe that the Products that they were purchasing contained high quality proteins that provided nutritionally more grams of protein per serving than the Products actually provided, and that the Products were appropriate for meeting protein dietary needs. Defendant had a duty to disclose the corrected amount of protein per serving in the NFP, as calculated according to the PDCAAS method, which Defendant failed to do.

120. Plaintiff and those similarly situated relied to their detriment on Defendant's false, misleading and deceptive advertising and marketing practices, including each of the misrepresentations and omissions set forth above. Had Plaintiff and those similarly situated been adequately informed and not intentionally deceived by Defendant, they would have acted differently by, without limitation, refraining from purchasing Defendant's Products or paying less for them.

121. Defendant's acts and omissions are likely to deceive the general public.

122. Defendant engaged in these false, misleading and deceptive advertising and marketing practices to increase its profits. Accordingly, Defendant has engaged

in false advertising, as defined and prohibited by section 17500, *et seq.* of the California Business and Professions Code.

123. The aforementioned practices, which Defendant used, and continues to use, to its significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendant's competitors as well as injury to the general public.

124. As a direct and proximate result of such actions, Plaintiff and the other members have suffered, and continue to suffer, injury in fact and have lost money and/or property as a result of such false, deceptive and misleading advertising in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

125. Plaintiff seeks, on behalf of himself and those similarly situated, full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Defendant from Plaintiff, the general public, or those similarly situated by means of the false, misleading and deceptive advertising and marketing practices complained of herein, plus 16interest thereon. Pursuant to Federal Rule of Civil Procedure 8(e)(2), Plaintiff makes the following allegations in this paragraph only hypothetically and as an alternative to any contrary allegations in his other causes of action, in the event that such causes of action will not succeed. Plaintiff and the Class may be unable to obtain monetary, declaratory and/or injunctive relief directly under other causes of action and will lack an adequate remedy at law, if the Court requires them to show class-wide reliance and materiality beyond the objective reasonable consumer standard applied under the FAL, because Plaintiff may not be able to establish each Class member's individualized understanding of Defendant's misleading representations as described in this Complaint, but the FAL does not require individualize proof of deception or injury by absent Class members. *See, e.g., Ries v. Ariz. Bevs. USA LLC*, 26 287 F.R.D. 523, 537 (N.D. Cal. 2012) ("restitutionary relief under the UCL and FAL 'is available without individualized proof of deception,

reliance, and injury.'"). In addition, Plaintiff and the Class may be unable to obtain such relief under other causes of action and will lack an adequate remedy at law, if Plaintiff is unable to demonstrate the requisite *mens rea* (intent, reckless, and/or negligence), because the FAL imposes no such *mens rea* requirement and liability exists even if Defendant acted in good faith.

126. Plaintiff seeks, on behalf of himself and those similarly situated, a declaration that the above-described practices constitute false, misleading and deceptive advertising.

127. Plaintiff seeks, on behalf of himself and those similarly situated, an injunction to prohibit Defendant from continuing to engage in the false, misleading and deceptive advertising and marketing practices complained of herein. Such misconduct by Defendant, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendant will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendant to which it is not entitled. Plaintiff, those similarly situated, and/or other consumers nationwide have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

**<u>THIRD CLAIM FOR RELIEF</u>**

**Violations of the Consumer Legal Remedies Act ("CLRA"),**

**Cal. Civ. Code §§ 1750 *et seq.***

128. Plaintiff repeats and realleges each and every factual allegation contained in the foregoing paragraphs as if fully set forth herein.

129. Plaintiff brings this claim individually and on behalf of the members of the proposed California Class against the Defendant.

130. At all times relevant hereto, Plaintiff and members of the California Class were "consumer[s]," as defined in Civil Code section 1761(d).

131. At all times relevant hereto, Defendant constituted a "person," as defined in Civil Code section 1761(c).

132. At all times relevant hereto, the Products manufactured, marketed, advertised, and sold by Defendant constituted "goods," as defined in Civil Code section 1761(a).

133. The purchases of the Products by Plaintiff and members of the California Class are "transactions" within the meaning of Civil Code section 1761(e).

134. Defendant's acts, practices, and omissions, set forth in this Complaint, led customers to falsely believe that the Products contained high quality proteins that provided nutritionally the full amount of protein advertised on the product package. By engaging in the actions, representations and conduct set forth in this Complaint, Defendant has violated, and continues to violate, § 1770(a)(2), § 1770(a)(5), § 1770(a)(7), § 1770(a)(8), and § 1770(a)(9) of the CLRA. In violation of California Civil Code §1770(a)(2), Defendant's acts and practices constitute improper representations regarding the source, sponsorship, approval, or certification of the goods they sold. In violation of California Civil Code §1770(a)(5), Defendant's acts and practices constitute improper representations that the goods it sells have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities, which they do not have. In violation of California Civil Code § 1770(a)(7), Defendant's acts, practices, and omissions constitute improper representations that the goods it sells are of a particular standard, quality, or grade, when they are of another. In violation of California Civil Code §1770(a)(8),

135. Defendant deceptively markets and advertises that, unlike other protein product manufacturers, it sells Products that provide nutritionally more grams of protein than the Products actually do. In violation of California Civil Code

§1770(a)(9), Defendant has advertised goods or services with intent not to sell them as advertised.

136. Pursuant to the provisions of Cal. Civ. Code § 1782(a), Plaintiff provided notice to Defendant of its alleged violations of the CLRA, demanding that Defendant correct such violations, and providing it with the opportunity to correct its business practices. Notice was sent via certified mail, return receipt requested on February 2, 2023. As of the date of filing this complaint, Defendant has not responded. Accordingly, if after 30 days no satisfactory response to resolve this litigation on a class-wide basis has been received, Plaintiff will seek leave to amend this request to seek restitution and actual damages as provided by the CLRA.

137. Pursuant to California Civil Code § 1780, Plaintiff seeks injunctive relief, reasonable attorneys' fees and costs, and any other relief that the Court deems proper.

138. Defendant knew or should have known that its Products did not contain the claimed characteristics because Defendant manufactured, marketed and sold its Products without those characteristics that it claimed. Defendant knew or should have known that its representations about its products as described herein violated consumer protection laws, and that these statements would be relied upon by Plaintiff and members of the California Class.

139. Defendant's actions as described herein were done with conscious disregard of Plaintiff's and California Class Members' rights and was wanton and malicious.

140. Defendant's wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA since Defendant is still representing that its Products have characteristics which they do not have.

## FOURTH CLAIM FOR RELIEF

**Unjust Enrichment**

141. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

142. Plaintiff brings this claim individually and on behalf of the members of the proposed Classes against the Defendant.

143. At all times relevant hereto, Defendant deceptively marketed, advertised, and sold merchandise to Plaintiff and the Classes.

144. Plaintiff and members of the Classes conferred upon Defendant nongratuitous payments for the Products that they would not have if not for Defendant's deceptive advertising and marketing. Defendant accepted or retained the nongratuitous benefits conferred by Plaintiff and members of the Classes, with full knowledge and awareness that, as a result of Defendant's deception, Plaintiff and members of the Classes were not receiving a product of the quality, nature, fitness, or value that had been represented by Defendant and reasonable consumers would have expected.

145. Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff's and Class Members' purchases of the Products. Retention of those monies under these circumstances is unjust and inequitable because of Defendant's misrepresentations about the Products, which caused injuries to Plaintiff and Class Members because they would not have purchased the Products if the true facts had been known.

146. Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiff and members of the Classes is unjust and inequitable, Defendant

must pay restitution to Plaintiff and members of the Classes for its unjust enrichment, as ordered by the Court.

## RELIEF DEMANDED

**WHEREFORE**, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a. Certification of the proposed Classes, including appointment of Plaintiff's counsel as class counsel;

b. An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

c. An award of compensatory damages in an amount to be determined at trial, except for those causes of action where compensatory damages are not legally available;

d. An award of statutory damages in an amount to be determined at trial, except for those causes of action where statutory damages are not legally available;

e. An award of punitive damages in an amount to be determined at trial, except for those causes of action where punitive damages are not legally available;

f. An award of treble damages, except for those causes of action where treble damages are not legally available;

g. An award of restitution in an amount to be determined at trial;

h. An order requiring Defendant to pay both pre- and post-judgment interest on any amounts awarded;

i. For reasonable attorneys' fees and the costs of suit incurred; and

j. For such further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated: February 2, 2023

Respectfully submitted,

By: /s/ J. Ryan Gustafson

J. Ryan Gustafson (SBN 220802)
**Good Gustafson Aumais LLP**
2330 Westwood Blvd., No. 103
Los Angeles, California 90064
Telephone: (310) 274-4663
jrg@ggallp.com

Steffan T. Keeton*
**THE KEETON FIRM LLC**
100 S Commons, Suite 102
Pittsburgh, PA 15212
Telephone: (888) 412-5291
stkeeton@keetonfirm.com
**pro hac vice* to be sought

*Counsel for Plaintiff and the Class*